Our next case is Derek Royster v. United States of America and his two generals. May it please the Court, David Jones on behalf of the appellant, Derek Royster, I'd like to request three minutes for rebuttal. In our briefs we raised three points, three grounds, independent grounds for reversal of the District Court's judgment that Mr. Royster's claims were time barred by a mere two days. The first, that the District Court started the statute of limitations block too early. The second, that he stopped it too late. And then thirdly, that the failure to appoint counsel was an abuse of discretion. I'd like to address, make a few points about each of those grounds very quickly. But first, I want to make sure that one point in our brief is not lost on the Court amidst all the back and forth on the statute of limitations issue. It is that the District Court never adequately considered Mr. Royster's medical negligence claim. As you recall, both the magistrate judge and the District Court had two occasions to address his claims on summary judgment. The only time the medical negligence claim was addressed was in a footnote in the magistrate judge's first report recommendation, where she acknowledged that the claim would likely be timely, but that he had couched it as a constitutional claim, which it would be required to bring under Bivens, and not as a common law tort claim that he would have to bring. What if Mr. Royster's medical negligence claim didn't support his medical negligence claim? I think oftenly he would have, but I think it's important. If he had all of that, wouldn't he have to follow a certificate of merit? It does, Your Honor. That's certainly nothing that's been raised by the government here, and certainly something that, with the benefit of counsel. Didn't the government raise it in this time in general?  Right. And I think it's important to put that in context for a few reasons. One, it was never addressed by the District Court as a ground for summary judgment, but it is significant. Why? For two reasons. One, it would be in tension, I think, with the decision not to appoint counsel. But more importantly, the way this case unfolded, it essentially was treated as a bifurcated case where statute of limitations was treated as a threshold jurisdictional issue, even though, as we say in our brief, the timeliness issue is not jurisdictional. But the court essentially addressed it that way. The parties briefed it after the government lost. The first time they had limited discovery just on the timeliness issue, and then they moved for summary judgment again. There was no real merits discovery. So I think it's difficult to fault Mr. Royster, putting aside our arguments for why he should have had counsel to assist him. It's difficult to fault Mr. Royster for not offering, in the context of what was a pure statute of limitations case, as far as it was dealt with in the District Court, to have obtained an expert and offered medical evidence at that stage of the proceeding. So going back to the court's failure to address his medical negligence claim, again, the magistrate judge recognized in the footnote that the claim would likely be timely, but that he couched it incorrectly under the FTCA. We've noted in our brief that I think that's incorrect on the facts. He sued the right party. He didn't sue the BOP. He sued the U.S. government, as you do under the FTCA. He cited the FTCA jurisdictional statute. He made one passing reference to a deliberate indifference standard, which would obviously be a constitutional. That's correct. That's correct. Okay. Within two years. Well, I think we're talking about two things, two different things here. Okay. Right. Right. Well, I mean, I think backing up a few steps to the time bar here, as I understand it, was based on not his August 23rd filing of the court, but his mailing of his claim, his administrative claim to the BOP in 2005. And the question is, assuming for the moment that the Houston mailbox rule wouldn't apply and that we're bound by the receipt date by the BOP of his administrative claim, which was May 4th, 2005, did his medical negligence claim necessarily accrue? There's no possible dispute of fact that it accrued as of May 4th, 2005. And our argument is that certainly it's a very clean-cut case on the medical negligence claim because his claim is based on, as we must under Kubrick, you have to look at what the injury is and what the cause of the injury is. Those are the two pieces of knowledge that a plaintiff needs to have or reasonably should have had for the statute to start accruing. And his medical negligence claim is based on the worsening of his injury, not getting MRSA itself. He had MRSA when he first presented to medical services for a diagnosis. It's the worsening of that injury, which occurred within the session limitations period, from May 4th forward. As of May 4th, he had just been diagnosed with MRSA two days earlier. He had received treatment for it. It was brand new, for lack of a better phrase. But... No. No. He starts writing, you know, from our perspective, you know, the beauty is we just need to get two days. We just need to get from May 2nd when he's told to be diagnosed to May 4th, or frankly to May 3rd because anything on May 4th would be timely. If it hasn't gotten worse within that time frame, or if there's at least an issue of fact as to whether it's gotten worse within that time frame, you can't say that his claim accrued as of that time. And that's just on the injury element. There's the causation piece, which here, as it pertains to his medical negligence claim, is that it was the inadequate treatment he received that caused his condition to worsen. And certainly he could not have suspected the prison official or the doctors and staff that treated him were responsible for his worsening condition before it worsened. So that necessarily, too, would have occurred within the statute of limitations. So is the implication that the visits he made to the health care unit where he didn't get treated for MRSA in the interim are inadequate treatment? I think it's a combination of things. It's his requests for treatment going unheeded, which is reflected in a number of inmate requests he made to the prison where he makes... But were those requests made to the right point to get treatment? Made to the right point? I mean, he didn't actually go into the medical unit. What we know from this record is that he sent a request that was addressed to the medical unit. It's unclear whether or not he actually presented. But I would say that's just one piece of the negligence on behalf of the health services department. It's also when he did, in fact, present, and he had a history of MRSA, they told him, we don't need to take a culture. This is procedure. We just give you some antibiotics and send you on your way. But clearly that wasn't working. Yet every time he came, he had the same experience. He would say, I've had MRSA before. They well knew it. And they would refuse to test him until it turns out, in fact, he did have MRSA again when they finally took the test. And one other piece of, I think, key information on that. But you're making, I guess, you're making something that he had MRSA and was overdue. So that he was going to the lobby. Adam May, the next time he went, he was in the lobby. Right. Right. And they treated him for what they considered to be an appropriate diagnosis. They didn't need a culture at that time. How do we know that? We don't. But I think for purposes of the accrual issue, we're asking what a reasonable person in that situation, in Royster's situation, would have thought. And they would have thought that, I've had MRSA before. They're telling me that, don't worry. We're not going to even take a culture to figure out whether you have MRSA. We're just going to give you medications and send you on your way. And that's the point where you would say, something's not right because I'm not getting better and I'm only getting worse. And meanwhile, and this sort of dovetails with the conditions claim, there are a lot of other people in this period, this period within the statute of limitations, becoming affected. So all these factors, I think, are coming together to, at that point, put you on notice. Is this where an expert witness comes in? I'm sorry? Is this where an expert witness would come in? I think it's one place where an expert witness would come in. Though, again, I still think for the accrual issue, I don't think you need expert attestment on the accrual issue. But on the merits. He would depend upon expert witness to say, at this juncture when he presented the treatment, it should have been X rather than Y. That's right. That's right. On the conditions claim, I want to quickly go through sort of how we've gotten to the point where we are on the conditions claim because I think it's very telling. The whole accrual issue traces its roots to a half-page DOP letter to Mr. Royster denying his administrative claim on May 25, 2007. No analysis of when his claim accrued. There was an acknowledgment that he was injured on or about April 23, 2005, which is the date that he first presented with MRSA symptoms that not even the doctors knew at that point was MRSA because they had to culture it and get the results back. And he certainly didn't even know that he had MRSA until May 2. So clearly there was no analysis of the cubic factors by the DOP in denying his claim is untimely. So that's what started this whole mess, if you will, from our perspective. And since then, the government's tried every which way to defend that half-page letter. They moved for summary judgment once. It's denied. They have the opportunity to take additional discovery deposing Mr. Royster to come back and take another shot at summary judgment. And what I think is very telling is despite deposing him on the timeliness issue, there's not a page of his deposition transcript they attached to their second summary judgment motion in support of the timeliness issue. In fact, the couple of pages they did attach were on the expert failure to get an expert issue. But even that, that's helpful. And Mr. Royster points out that his testimony was that he was unaware that anyone else had MRSA at the time he first got it. So, again, a helpful fact for our accrual argument. But so they don't attach it. So clearly there was nothing helpful from Mr. Royster's deposition. Otherwise, it clearly would have been in their summary judgment argument. There's no affidavits from the corrections officer who Mr. Royster claims told him that the washing machines were operated at insufficiently hot temperatures. There's no affidavit from the physician assistant who treated him when he first presented with MRSA and who told him about MRSA and could have said, here's what I told him about MRSA and how it's caused. None of that. Instead, they rely on a single affidavit, or I think it's a declaration actually, from a prison official, a six-paragraph declaration saying, I held some town hall meetings at some unspecified point in time, maybe 14 months in advance of when Mr. Royster got his MRSA. And I also put some fact sheets in the housing unit. It's just the government's argument that the question is not what caused the MRSA, it's the question of who caused it. He's in prison, so it's obvious that MRSA doesn't happen without some intervention somewhere, that it had to be the government. And getting to that point, I'll get to it now. I think the key is the flaw in that argument, which essentially reduces to this, is that if you're in control by one entity and you get an injury, you get sick, just because if there were someone who caused it, it could only be that person because they controlled you, you're on notice of the cause. But there's a question you have to ask first is, why would I think that there was a who, that there was a person or there was an entity that, through their wrongdoing, is in the causal chain of why I got this medical infection? And as Dr. – as Judge Posner – If you're a person who's responsible for the care of the inmate, you certainly have to live in a sanitary environment. Right, but there's an assumption even in that that it's related to how sanitary the environment is. I think it's so fact-dependent on what he knew when about MRSA, and I think based on this record it's that he knew next to nothing. And as Judge Posner said in the Drazen case, that what the government is arguing for, these circumstances where as soon as you find out what the injury is, you've got to start pointing the finger and figuring out who did it, would lead to ghoulish consequences because you would immediately start filing lawsuits or start digging through the government's files in search of wrongdoing. And that's just – that's not the standard. The causation standard requires a who. You have to show – your claim does not accrue until you have reason to believe that something that could be explained by innocent causes or natural causes may have in fact been caused by or another contributing factor is a who, the government, something they did. And it's until that time arrives that your claim does not start to accrue. Thank you. May it please the Court, AUSA, Don Van Kokus on behalf of the United States. I think where the rubber meets the road in this appeal is the issue that you brought up first, Judge Van Aske, which is it's an issue that's not addressed in the opening brief of Mr. Posner and very begrudgingly addressed in his replied brief, which is that in this case we move for summary judgment not only on the jurisdictional issue of the presentment of the FTCA claim, but on the substantive issue of Mr. Royster's inability to make out a prima facie case of any kind of negligence without expert testimony. We brought that in our summary judgment. That's at pages 73 to 77 of my supplemental briefs. He opposed our motion, but didn't mention that at all. And in fact, he had conceded since 2008 that he knew he needed an expert to go forward. In fact, he asked the District Court to approve him an expert. The District Court denied his motion, and that order is not under appeal in this case. So what we have here is in a summary judgment posture. It's not about what Mr. Royster could have proved if he had had counsel to obtain an expert for him. It's about what he was going to be able to prove to prove if this case were to go to trial. And everyone acknowledged he needed an expert. He didn't have one. So when you look at the case in that light, the critical issue becomes the issue that Mr. Royster raised third in his brief, which is the appointment of counsel issue. The District Court in this case applied the Tabron factors. Could you stand just a little bit back from the microphone? Yes, I'm popping a little bit. I'm sorry. The District Court applied the Tabron factors in this case faithfully. There's no suggestion that she applied the wrong law. She applied the Tabron. There's also no suggestion that she made any clear, clearly erroneous findings of fact in the denial of counsel issue. And I won't belabor the points made in my brief, but what I argue is— The point of this appeal was whether the complaint was presented to the Bureau of Prisons within the statute of limitations period. That's the way that Mr. Royster has briefed the appeal. But as we pointed out in our response brief, we move for summary judgment also on the merits. And no one disputes that Mr. Royster needed an expert and doesn't have one. But the decision before the District Court was it wasn't timely. Absolutely. And the District Court didn't reach our expert issue. But this court can infer upon any basis supported by the record, and we'd argue that that is a valid basis. So I'm not trying to skirt the accrual issue or the mailbox rule issue. I'm just pointing out that we've moved on an alternate basis. It's not our fault that the District Court didn't reach that as an alternative holding, and there's no dispute on appeal that that would be dispositive, I think. Now, in this case— I used to defend a lot of medical malpractice cases, and it was never an issue in the beginning as the case was filed that a medical expert was needed. Now, once full discovery was taken, if the plaintiff didn't have a medical expert, that was the end of it. But it's not my understanding that this case ever got to that point. Well, we did do full discovery. I know that Mr. Royster says that we didn't. That's because he didn't depose anybody or get an expert. But we all exchanged documents. We went through two rounds of summary judgment. And, in fact, after the second round of summary judgment, Mr. Royster— after the first round, Mr. Royster said, We're ready for trial. We don't need any more discovery. That was his response when we moved to depose him. So by his own admissions in the District Court, he thought we were done. But we've been through two rounds of that. He did need an expert, and that's a dispositive issue. The District Court, which she— I think he needed an attorney. I'm sorry? I think he needed an attorney. Well, and so now we come to the question of whether the District Court abused her discretion in denying his motion for appointing counsel. She applied the Taborn factors. And, again, I won't belabor the point, but the only factor which wasn't entirely redundant of his IFP status, which cut in favor of appointing counsel, was the fact that he needed an expert. Isn't the fact that she tried to find counsel to get the motion to be granted? No. If anything, Your Honor, it actually moves the motion because, as this court said in Taborn, this court said it would have a very difficult time finding an abuse of discretion when a court tried to search for counsel to take on a case pro bono and was met with flat refusals. As a district judge, I have put on the case and ran motions for appointing counsel and then tried to find counsel, but I couldn't help it. That was the end of it. I can't force somebody to take the case. But my experience as a district judge is that when a judge says, I'm appointing you counsel, the lawyer says, yes, ma'am, or yes, sir, as opposed to yes, ma'am. Well, and in this case, we know that didn't happen because the District Court asked several attorneys up in the area to step forward and take the case, and they all declined. So, I mean, in our view, that moves this whole issue of whether she applied Taborn faithfully or not. And I think Mr. Royster's response is, well, she should have asked attorneys down here in Pittsburgh to take the case. But again, we don't have any allegation that she misapplied Taborn or found facts incorrectly, so we're left with the question whether can this court say that no reasonable court sitting with an Erie case would have refrained from asking attorneys 100-plus miles away to step in and take that case pro bono. And I think it's clear the answer to that is we can't say that's unreasonable. Now, he points out... Well, it isn't actually in the record, is it, that attorneys were in fact asked and refused? Yes, it is. It's sort of a side comment, is my understanding. Well, but the side comment's in the record. I mean, in the course of her denying his eighth or ninth request for appointment of counsel, she said very clearly, I asked several attorneys, several local attorneys to take this case. They all refused. I think we have to take the district court at its word. And when you add that to the fact that we have on our record that Mr. Royster asked several attorneys, one in D.C., one in West Virginia, one in Pittsburgh, to take the case, and they all refused, what you add up to is the market has spoken and the attorneys were just unwilling to take this case on a contingency. So Mr. Royster cites a docketed case called Knighted where evidently this magistrate judge did ask attorneys in Pittsburgh to take a case pro bono arising out of Erie. But what he doesn't tell the court is the way Knighted resolved was the court asked those attorneys at the ACBF. They all refused. So what this boils down to is Mr. Royster has to show why it's somehow worse that several attorneys in Erie said no to his case and how that would be somehow worse than several attorneys in Pittsburgh saying no to his case. And his optimism that he would have got a different answer than the plaintiff in Knighted did isn't supported by anything. So if you look at the case in that light, I think it does boil down to the fact that there wasn't an expert. There needed to be an expert. We had plenty of time for him to get one. He'd been admitting this for years. And they haven't appealed the denial of the expert. And when you match that with the fact that the district court applied Taborn faithfully, that's where we wind up. Now, if this court wants to reach, I consider them the more interesting intellectually issues of the accrual and the mailbox rule, the accrual issue, the standard of review is set forth by this court in the Miller case, which is that in an FTCA case, on summary judgment, accrual facts are reviewed for clear error and the application of the law is reviewed de novo. Mr. Royster takes some issue with that and has to reply briefly. That is what that case says. But giving him every benefit of the doubt, assume we apply the traditional summary judgment standard of review. So we ask whether there's any genuine disputed issue material fact which would have precluded summary judgment for us. And I propose that there are three clusters of facts of which there's no genuine material dispute. The first is that in March 2005, McKean removed the washing machines from the inmates' housing units. At that point, they had to send their laundry out to the institutional service for laundering. And Mr. Royster claims at page 239 of the appendix that as soon as that happened, his clothes started returning to him dirtier than when they were sent out. He claims that under oath. We dispute that that actually happened, but remember, for summary judgment, resolve that fact in the light most favorable to him. So assume that's true. Then by April 2005, at the very latest, Mr. Royster heard the town hall presentation where he was told what MRSA was, that it was going around the prison, and how it was communicated and prevented. Among other things, he was told that wearing unclean clothes could cause that. He never disputed any of that in the district court. He never disputed when it occurred. In both of his briefs, you know how important this is because in both of his briefs, now he's disputing when it occurred. But look at his response to our motion for summary judgment. He never disputed when it occurred. So for our purposes, either that's not a genuine issue of material fact or else it's waves. And then finally, the last cluster of facts begins April 23rd, 2005 when he appears for treatment with MRSA-like symptoms. He's told he's being cultured, tested for MRSA. He's tested, sent on his way. He returns April 25th, 2005 and gets treatment for symptoms. And then he returns again May 2nd where he's diagnosed with MRSA. Now I submit his theory of the case has been throughout this litigation even at the agency level, was that his MRSA was negligently caused by the BOP removing the washers from the inmates' housing units. So let's ask ourselves, when would that claim have accrued? So you're talking about the condition claim as opposed to the medical malpractice claim? Right, to the extent we differentiate them, yes. So the condition claim, when would that have accrued? And I submit that the Judicial Court got it exactly right, that it would have accrued by May 2nd if not earlier because under Kubrick, the accrual inquiry posits only two elements of the tort need be reasonably suspected by the injured party. And one is that you've been injured and who injured you. I think it's 152. When he filed, you nailed down April 23rd, 2012. Yes. And then the executed standard form 90 file was submitted on April 23rd, 2007. Right, right, yes. Okay. It sounds to me like two years. Two years, exactly, which means the instant he was completing the form, he had to have known it would be too late because the language in the form instructions say that a form is presented to the agency when it is received, not when it is mailed. So that is... Right, and who did he present it to? Well, when you say... It's unclear who he handed it over to within McKean, but I think we have to assume he handed it over to someone for mailing. So he handed it over... Who did they work for? They worked for the Bureau of Prisons. I think I see where you're going with this, Your Honor. So let me see. I'm having trouble for asking how he didn't present it in two years. Right. So here's how. There's a Supreme Court case from 1916 called United States v. Lombardo, on the 20th jadis. I didn't really know where we were going here, but that one says that when a claim to an agency is presented, it's got to be presented to the right person. You can't just hand it to anybody who happens to be with the agency. That case was cited with approval in the FTCA context in the Seventh Circuit in an unpublished decision from 2002 called Overcast v. United States Postal Service. And what that case essentially says is there the person was suing the postmaster, and her argument, I think, was, well, as soon as I put it in the mailbox, it's all one agency. The mailbox has it. And the Seventh Circuit says no, and it's cited Lombardo. So it's our position that it isn't enough just for him to hand it to someone inside the Bureau of Prisons. Now, if the court wants to go to the mailbox rule issue, I think we stand by what our brief said, what the district court said beautifully, in my opinion, which is that the dividing line between cases where the prison mailbox rule is applied and where it's not is whether the case seems more like the rule at issue in Houston versus the statute at issue. The Longinette case says that very, very clearly. Now, the district court in this case decided that the statute at issue was more like, rather, the regulation at issue, 28 CFR 14.2, was more like the statute at issue in effects. And that dovetails with what this court already had held in the Lightfoot case, where it held that no mailbox rule applies in FTCA cases. Of course, that's a different situation, because the plaintiff is not a prisoner. Absolutely. But the court relied on the same regulation that we contend is dispositive of the issue in the after effects, which is 28 CFR 14.2, which says that a claim is presented to an agency when the agency receives it. So for us, it doesn't matter that it's a prisoner versus a non-prisoner. All that matters is we have this rule. And of course, if we are persuaded by the appellant's accrual arguments, we don't have to worry about the mailbox rule. That's right. That's right. But in this case, I think where we wind up is, excuse me, my throat's getting a little bit dry. Where we wind up is we have a rule which directly addresses the issue. The rule's much more like the statute at issue in effects than it is like the rule at issue in Houston. Now, I don't dispute that there are solitary policies behind the prison mailbox rule. But I think after, in light of Houston and effects together, you actually can't apply them if you're faced with a statute or a regulation which clearly speaks on the issue. I mean, the regulation has the force of law. At the very least, it's entitled to deference and a sheriff. And they've not attacked it at all. If I could have just a minute or two more to discuss the accrual issue, I'd appreciate it. OK, thanks, Your Honor. I think where we come out in light of the undisputed facts that I set forth initially is his conditions claim would have accrued by May 2 because he knows that he's been injured, even though the name of it is MRSA. And he knows who injured him, either because it can't have been anyone else. He's inside the Bureau of Prisons. Or because by his own thinking, he has said the prison laundry service caused him to contract MRSA. And we know that he knew his clothes were coming back dirty as of March or April 2005. If you add that up with what he heard at the town hall presentation, a reasonable person in his position would have known or should have suspected the who behind it. The same thing applies, I think, for his claim that continuing treatment post-dating May 2, 2005 somehow managed to accrue later. And I think what you have to look at is this court's case in Tominski, footnote 5, says that this circuit doesn't apply the continuing treatment doctrine to toll the presentment requirement for FTCA claims when the person has knowledge of the facts giving rise to an inference of negligence earlier. Of course, the claim is not that the first treatment was negligent. The claim, as I understand it, is that the follow-up was not given. No, Your Honor. And that could not have been back and met. Well, Your Honor, even if that's what he's claiming now, what he said in his administrative claims, I think this was page 239 of the record, where he said, under oath, on all of my visits to health services, my complaints of pain and discomfort were met with a blind eye or a deaf ear or whatever it was. Well, all of his visits began on April 23, 2005, April 25, May 2. Now, the record contradicts him on those dates and thereafter. But the point is, if we take him at his word, his claim of negligent treatment accrued on April 23. And the only way he could possibly get around the statute of limitations is if he could somehow show after the pitch line. But again, we're dealing with an unrepresented prisoner. And his appreciation of some of the intricacies of medical malpractice law, should they be held against him? Well, maybe if he's unaware of the intricacies. But the only thing he really needed to know was that he needed an expert. And he knew that and acknowledged that early on when he was asked. And he asked for one. And he asked for an attorney. He asked for an expert. They're not appealing that order. He asked for an attorney. And the only way that, in light of his need for an expert, the only way that his request for an attorney makes any difference is if the district court abused his discretion. And we contend that it couldn't have abused his discretion, in light of the fact that it applied to Iran and asked attorneys to step forward. And no, it didn't. He can't get blood out of an attorney, I guess. Anyway, I see him way over time. So the government would ask that this court affirm the district court's decision. Mr. Dennis? Thank you, Your Honor. I'd like to respond to several points that the government makes, first and foremost on the appointment of counsel issue. The district court, the magistrate judge's order expressing that she had made some attempts to appoint counsel. I think it's very interesting to look at her language. It's JA-26. She says, this court has made several unsuccessful attempts to obtain the assistance of a local attorney to handle plaintiff's case. Now, the problem here is that in abuse of discretion review, you have to know what she did. We're not doubting that she did something. We would never suggest something like that. But unsuccessful attempts to obtain the assistance of a local attorney. Is that one attorney? Did you contact several attorneys? Does unsuccessful mean that they didn't call you back, or that they reviewed the case and had no merit? We don't have that information. And unlike the NYSIG case that we cite in our reply brief, where she did grant the appointment of counsel and then reached out to the Allegheny Bar Association here in Pittsburgh, there were letters sent in by the attorneys who were contacted, four in total. And I think they're under seal, but my understanding is those letters would express their reasons why they weren't going to take the case. That gives the court a basis to review what was done. And we just don't have that here. A few other points on the accrual issue. Is Mr. O'Regan still in prison? He is. He's due to be released, I believe, early next year. A few other quick points, factual issues, that are in dispute that the government says are not. The government suggests that Mr. Royster was complaining about his laundry coming back more dirty. They take, they rely on some forms that he submitted to the prison in September of October of 2006. We're talking well more than a year after he got MRSA, when he's complaining about it in retrospect. Not any contemporaneous evidence that he acknowledged the washing machines weren't operating, or they weren't being operated appropriately. On the argument that he heard the town hall meeting, he did, in his opposition to the first summary judgment motion, say there was a town hall meeting. And he attached a memo from the warden from August 2007. Now we're talking, it might be August 2006, but either way, well after he had contracted MRSA, it referred to a MRSA town hall meeting, giving him the benefit that he's entitled to on summary judgment. That's the town hall meeting he's referring to. And even looking again, just yesterday, at the declaration that was submitted by the prison official who conducted these town hall meetings, there are inconsistencies right on its face. It says that I conducted town hall meetings in all eight of the housing units. Well, by my count, looking at JA-282, which is a MRSA case tracking form that begins on that page, there's at least 11 housing units. So it's not even clear that he may not have, in fact, held such a town hall meeting within Mr. Royster's housing unit. So that is clearly in dispute, and that's one of their only pieces of evidence that he was on notice the second that he got MRSA, the sirens should be going off, that it wasn't just MRSA that caused this, it was something the government did, the WHO portion. And very quickly, if I can address one really quick point on the Houston rule that I don't want to miss. We've obviously briefed the legal issue exhaustively, but it's important to note that we're constrained to only make a legal argument, because without counsel below, who would have obviously wanted to look into what was the actual date the agency received it. In most cases, it doesn't matter. Here it might. If it was in the BOP's mailroom on May 2nd, we've got a different outcome, and that's precisely the sort of discovery that counsel would have wanted to undertake. And I think that's an important point in addition to our legal arguments. As to the government's argument that he was complaining about his treatment from day one, the second he presented on April 23rd, 2005, again, they're citing to his Form 95 submitted two years later when he's looking back on this retrospectively. It's not evidence of what he was thinking or a reasonable person would have thought at the time. And then finally, the clear error standard. Again, I don't know how the government can stand by that as the applicable standard here for the reasons we set forth in our brief. The Miller case they cite includes language that didn't even apply in that case and was based on cases that had been decided after a trial on the merits where the district court obviously has something that you all don't have, the ability to see witnesses, hear what they have to say, as opposed to just reviewing the papers like you are here. Okay, Mr. Jones, we thank you very much. Thank you, Your Honor. We thank both counsel for excellent arguments in the case under discussion.